ORIGINAL

FILED
U.S. DIST. COURT
AUGUSTA DIV

Apr 16 9 28 AM '98

CLERK
SO DIST OF GA.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| HERBERT E. BRETT, DAVID | § | |
| HANNAH, WAYNE D. | § | |
| HATTAWAY, and JERRY O. | § | |
| HUDSON, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **Civil Action No. 1:93-144** |
| | § | |
| JEFFERSON COUNTY, GEORGIA, | § | |
| and CHARLES GARY HUTCHINS, | § | |
| individually and in his official | § | |
| capacity as SHERIFF, JEFFERSON | § | |
| COUNTY, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' TRIAL BRIEF

NOW COME PLAINTIFFS and file this trial brief to assist the court in the conduct of this trial.

### Introduction

Plaintiffs are four deputy sheriffs who failed to support the winning candidate in the 1992 campaign for Jefferson County sheriff. Zollie Compton, the Jefferson County Sheriff of thirty years, had announced his retirement, and thus there was no incumbent for the position. Two of the plaintiffs, Hudson and Hattaway, were actually candidates in opposition to the winning candidate, defendant Gary Hutchins, who at the time of the campaign and election was the incumbent Jefferson

1

84

County Tax Commissioner. Hattaway lost to Hutchins and Hudson in the initial July 1992 primary election, and Hudson lost to Hutchins in the August 1992 primary run-off election. The other two plaintiffs, Brett and Hannah, were Hudson supporters. Prior to assuming office, but after having won the November 1992 general election, and thus while sheriff-elect (and still incumbent Tax Commissioner), defendant Hutchins advised the four plaintiffs that he would not be reappointing them as his deputies once he assumed office in January 1993. All four plaintiffs thus lost their jobs on December 31, 1992.

Here, defendant Hutchins admits that plaintiffs were fired in large part because they failed to support his candidacy. The issues to be decided by the jury will be:

- What political speech/activity did the plaintiffs engage in (or refuse to engage in);
- What did Hutchins reasonably believe plaintiffs did;
- What was defendant Hutchins' motive in refusing to reappoint the plaintiffs.
- And, if defendants are liable, what are plaintiffs' damages.

The Eleventh Circuit has directed that this Court must determine, based on the jury's findings of fact, whether this is a "political patronage" case, thus requiring the use of the *Elrod-Branti* analysis, or whether, based on the factual findings at trial, this is a "public employee speech case", requiring analysis under the *Pickering* analysis (citations and discussion infra). A copy of the Eleventh Circuit opinion in this matter is attached hereto as Exhibit "A".

Plaintiffs will address three issues in this brief. First, plaintiffs suggest a bifurcated order of proof, with a ruling on qualified immunity to follow the liability portion of the trial. Second, plaintiffs will address which legal standard (the *Elrod-Branti* "political patronage" test or the *Pickering* "employee expression" test) should apply to the facts as they expect them to be proved at trial.

2

Finally, the plaintiffs will brief the issue of the inapplicability of qualified immunity in this case.

## I. Order of Proof

Plaintiffs believe that the Court should bifurcate the trial and first hear the presentation of evidence on liability. This would include presentation of evidence regarding the political campaign in which both plaintiffs and defendant engaged, as well as the presentation of evidence regarding defendant Hutchins' motivation for refusing to hire the plaintiffs. The jury should then make findings of fact as to the nature of the political activity in which the plaintiffs participated, the information upon which defendant Hutchins reasonably relied in terminating plaintiffs, and the actual motivating factors behind the plaintiffs' termination. These jury findings will be in the form of specially prepared interrogatories which are submitted as part of the pre-trial order, Attachment 23.

Based on these facts as found by the jury, the Court will then determine which legal test to apply to the facts. If the jury finds that plaintiffs were "fired" or not rehired based on their failure to support defendant Hutchins, and that Hutchins' real motivation in firing plaintiffs was their failure to support his campaign, the Court must apply the *Elrod-Branti* analysis. If the jury finds that plaintiffs were "fired" because of their speech, the defendants then have the burden of proving either that plaintiffs' speech was <u>not</u> protected, *Waters v. Churchill*, 114 S.Ct. 1878, 1884 (1994); *Freedman v. Maryland*, 380 U.S. 51, 58-60 (1965); *Speiser v. Randall*, 357 U.S. 513, 526 (1958), or that defendants' legitimate concerns for the efficient provision of services by the office of sheriff were outweighed by plaintiffs' first amendment rights to engage in protected speech - both decisions for the Court. If the jury finds that defendant acted with mixed motives, the jury must determine which motive predominated (the *Mt. Healthy* analysis is a jury determination, *Holley v. Seminole County School Dist.*, 755 F.2d 1492, 1505 (11th Cir. 1985). If the jury determines that the plaintiffs were

3

terminated because Hutchins had concerns about plaintiffs' fitness to serve as deputy sheriffs because of their speech, the jury must determine whether Hutchins reasonably believed what that speech actually was. *Waters v. Churchill*, 114 S.Ct. at1889.

Assuming the jury finds liability on some basis, the Court should then entertain a motion for qualified immunity for federal claims only from defendant Hutchins. In deciding this motion, the Court will apply either the *Elrod-Branti* or the *Pickering* analysis in determining whether the law was clearly established, depending on what facts the jury has found. After ruling on the qualified immunity issue, the Court should proceed to hear the presentation of evidence on damages. Even if the Court grants qualified immunity to defendant Hutchins on plaintiffs' federal claims, the effect is only that no monetary damages can be found against defendant Hutchins individually. To the extent that plaintiffs seek declaratory and injunctive relief against defendant Hutchins individually, he is not entitled to qualified immunity under any set of circumstances. Qualified immunity is a defense to monetary damages relief only, and not to declaratory and injunctive relief. *Fortner v. Thomas*, 983 F.2d 1024, 1029 (11th Cir. 1993). The United States Supreme Court recently reiterated that "the doctrine of qualified immunity shields public officials like the respondents from **damages** actions . . ." *Elder v. Holloway*, 114 S.Ct. 1019, 1021 (1994) (emphasis added). Thus, should the Court grant federal qualified immunity to Hutchins individually, the Court must still determine the appropriate declaratory and injunctive relief due to plaintiffs. Declaratory and injunctive relief are still mandated against Hutchins, and monetary as well as injunctive relief are still proper against Hutchins in his official capacity - e.g., Jefferson County.

Qualified immunity is a defense to federal claims only, and cannot insulate an actor against alleged violations of the Georgia Constitution. *D'Aguanno v. Gallagher*, 50 F.3d 887 (11th Cir.

4

1995); *Andrue v. Sapp*, 919 F.2d 637, 640 (11th Cir. 1990).

## II. The Choice of Legal Standards

The Constitution forbids the termination of government employees based on their failure to support the winning candidate unless political support is an essential component of the particular job involved. As the United States Supreme Court said most recently in 1990:

> To the victor belong only those spoils that may be constitutionally obtained. *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), decided that the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved.

*Rutan v. Republican Party of Illinois*, 110 S. Ct. 2729, 2731-32 (1990).[1]

In *Elrod*, the Supreme Court held that a newly elected sheriff was constitutionally forbidden from replacing his office staff with his own supporters "when the existing employees lack or fail to obtain requisite support from, or fail to affiliate with, that party." *Elrod v. Burns*, 427 U.S. 347, 351 (1976). The *Elrod* plurality held that conditioning public employment on support for the winning candidate "unquestionably inhibits protected belief and association." *Id.*, at 359. "[P]olitical belief and association constitute the core of those activities protected by the First Amendment." *Id.*, at 356. Plaintiffs believe that *Elrod* controls the disposition of this case.

Because political beliefs and actions based thereon constitute fundamental rights, the government may restrict those rights only when it advances a compelling interest, and then only when it does so in the least possible restrictive manner. If loyalty is the concern, then only those employees

---

[1] *Rutan* held that employees were also protected against adverse actions involving promotions, transfers, recalls, and hiring decisions based on political patronage. *Id.*, at 2739.

5

in policymaking positions would be subject to dismissal; if political disagreements threaten work

performance, then only those who actually perform poorly could be dismissed. *Elrod,* 427 U.S. at

365-67.

> It is firmly established that a significant impairment of First
> Amendment rights must survive exacting scrutiny. [cits]. "This type
> of scrutiny is necessary even if any deterrent effect on the exercise of
> First Amendment rights arises, not through direct government action,
> but indirectly as an unintended but inevitable result of the
> government's conduct. . . . " [cits]. Thus encroachment "cannot be
> justified upon a mere showing of a legitimate state interest." [cits].
> The interest advanced must be paramount, one of vital importance,
> and the burden is on the government to show the existence of such an
> interest. [cits]. In the instant case, care must be taken not to confuse
> the interest of partisan organizations with governmental interests.
> Only the latter will suffice. . . . In short, if conditioning the retention
> of public employment on the employee's support of the in-party is to
> survive constitutional challenge, it must further some vital government
> end by a means that is least restrictive of freedom of belief and
> association in achieving that end, and the benefit gained must
> outweigh the loss of constitutionally protected rights.

*Id.,* at 362-3 (footnotes and citations omitted).

Thus the *Elrod* plurality held that:

> Limiting patronage dismissals to policymaking positions is sufficient
> to achieve this governmental end [need for political loyalty of
> employees . . . to the end that representative government not be
> undercut by tactics obstructing the implementation of policies of the
> new administration, policies presumably sanctioned by the electorate].
> Non policymaking individuals usually have only limited responsibilities
> and are therefore not in a position to thwart the goals of the in-party.

*Id.,* at 367.

In 1980, following *Elrod,* the Supreme Court held that a newly appointed public defender

violated the First Amendment in discharging assistant public defenders because they did not have the

6

support of the political party in power. *Branti v. Finkel*, 445 U.S. 507, 517 (1980). *Branti* holds (contrary to the suggestion in *Elrod* that policymaking and confidential employees could perhaps be dismissed on the basis of their political views, 427 U.S. at 367) that the government demonstrates a compelling interest in infringing on core First Amendment rights **only** when it shows that "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518.

*Elrod, Branti,* and *Rutan* involved public employees at will, with no property interest in continued employment. First Amendment rights do not hinge on whether an employee has a constitutional entitlement to his or her job. *Elrod,* 427 U.S. at 359-60; *Branti,* 455 U.S. at 514-15; *Rutan,* 110 S. Ct. at 2736.

Cases from the Eleventh Circuit and the district courts of Georgia confirm that public employment may not be conditioned on support for the winning candidate. In *Stough v. Gallagher,* 967 F.2d 1523 (11th Cir. 1992), a case strikingly similar to this case, the incumbent sheriff retired, a deputy sheriff, Gallagher, ran for sheriff, and another long-time deputy, Stough, supported another candidate, refusing to support Gallagher. Upon taking office, Gallagher demoted Stough. *Id.,* at 1524. Stough brought a § 1983 action alleging that Gallagher's retaliation against him because of his political speech in support of the losing candidate was a clearly established right.

The Eleventh Circuit analyzed *Stough* as a free speech case rather than a political patronage case. *Id.,* at 1527-28. In so doing, it utilized the *Pickering*[2] balancing test, and determined that "the *Pickering* balance must lead to the inevitable conclusion that Sheriff Gallagher's action was unlawful

---

[2] *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), in which the Supreme Court announced that the free speech interests of public employees must be weighed against the interest of "the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

7

[and] we need not decide the precise result of applying the *Pickering* balancing test to this case." *Id.,* at 1528. Since Stough's speech was "commenting on the qualifications of political candidates", the court found this speech "`is more than self-expression; it is the essence of self-government' and occupies the `highest rung of the hierarchy of First Amendment values' entitling it to special protection." *Id.,* at 1529. Additionally, as Stough's speeches were made during his off-duty hours, to potential voters, before Gallagher became sheriff, and while voters were still seeking information on the candidates, and as his speeches were neither rude nor insulting, these factors "greatly tip[ped] the *Pickering* balancing scale in Stough's favor." *Id.* Gallagher's assertions of the need for absolute loyalty from all deputy sheriffs were easily rebutted by the fact that, after assuming office, he adopted a merit system, which showed that personal political loyalty and confidence were prerequisites only for officers above the rank of captain. *Id.*

Plaintiffs believe that *Stough* wrongly utilizes *Pickering* rather than relying on the holdings of the Supreme Court political patronage cases cited *supra.* Nevertheless, regardless of the analysis used, the *Stough* court correctly found that the law is clearly established that a public employee cannot be retaliated against for supporting the wrong candidate.

In *Sykes v. McDowell,* 786 F.2d 1098 (11th Cir. 1986), a newly appointed sheriff, McDowell, demanded that deputy Sykes support him in an upcoming election. Sykes declined to get involved and was eventually fired. The Eleventh Circuit, citing *Wooley v. Maynard,* 430 U.S. 705 (1977), and *Berry v. Bailey,* 726 F.2d 670 (11th Cir. 1984), affirmed that Sykes' refusal to support McDowell was constitutionally protected. *Id.,* at 1104. *See also Nicholson v. Gant,* 816 F.2d 591 (11th Cir. 1987).

In *Lovell v. Floyd County,* 710 F.Supp. 1364 (N.D. Ga. 1989), a county tax appraiser contended that he was fired for his support of a particular appraisal methodology. The court

8

correctly analyzed *Lovell* as a "free speech" rather than a "raw political patronage" case. *Id.*, at 1375.

As the court stated:

> If the discharge involves "raw political patronage," *i.e.*, one's allegiance to a particular political party or candidate, then the discharge is constitutional *if* the employee possessed a confidential, policymaking position and his political allegiance "would undermine rather than promote effective job performance." [*Terry v. Cook.* 886 F.2d 373,] 376 [11th Cir. 1989)], *citing Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980).

*Id.* The *Pickering* balance test is inapplicable in "raw political patronage" cases. Rather, the only question to ask is whether the affected employee's job is of such a confidential and/or policymaking nature that political allegiance is a requirement for effective job performance. *See also Terry v. Cook*, 866 F.2d 373, 376-77 (11th Cir. 1989) (explaining distinction between "raw political patronage" and "personal political loyalty" cases); *Barnes v. Bosley*, 745 F.2d 501 (8th Cir. 1984), *cert. denied* 471 U.S. 1017 (employees of clerk of Circuit Court protected as political affiliation not appropriate consideration; "*Pickering* balancing test need not be used in determining whether the first amendment protects political affiliation." *Id.*, at 506). *But see Click v. Copeland*, 970 F.2d 106 (5th Cir. 1992) (utilizing *Pickering* test).

In this case, it is conceded that all the plaintiffs' jobs were non-confidential and were not policymaking positions. In fact, when defendant Hutchins was asked in deposition if there were any policymaking or confidential duties that anyone other than he performed, he responded in the negative. Plaintiffs will also show that the job description of a deputy sheriff contains no confidential or policymaking elements. There will be no evidence showing that plaintiffs' jobs were of a confidential or policy-making nature, or that political affiliation was an appropriate requirement for these job duties.

9

If the jury finds that plaintiffs were terminated because they failed to support the defendant's political campaign, and that political allegiance was not required for their jobs, the Court should then apply the *Elrod-Branti* analysis. The jury must then determine whether "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. 518; whether "party affiliation is important to effective performance of the job at issue." *McCabe v. Sharrett*, 12 F.3d 1558, 1565 (11th Cir. 1994). If the jury finds that political affiliation is not an essential element for the effective performance of the job of deputy sheriff, then the Court must rule for the plaintiffs.

The *Elrod-Branti* line of cases is the appropriate tool for analysis because the facts will demonstrate plaintiffs were terminated for failing to support defendant Hutchins. Other deputies that supported other candidates in the primary and run-off, but who later switched their support to defendant Hutchins in the run-off and in the actual race, were not terminated. Deputies James Hannah, Brad West, Alan Wasden, Robert Chalker, Chip Evans and John Cholar initially supported plaintiff Jerry Hudson when he was running in the primary and/or run-off. Each of them later demonstrated support for defendant Hutchins. Chalker, Wasden, West and Evans all erected Hutchins yard signs. Chalker Dep. p. 10; Wasden Dep. p. 10. Cholar did not erect a yard sign because he lives in a remote location, but he did express verbal support of Hutchins to voters. Cholar Dep. p. 26, 28. After the run-off election in August, Hannah and Brett were told if they wanted to retain their jobs they needed to put yard signs supporting Hutchins in their yards. They refused to do so. The requirement that one erect a yard sign in support of a particular candidate or otherwise support a particular candidate in order to retain one's job is a "raw test" of political affiliation clearly implicating *Elrod-Branti*. Moreover, the evidence will show, and plaintiffs expect that the jury will find, that the

10

job duties of the deputy sheriffs did not include confidential or policy-making duties, which are the categories of activities for which political loyalty can be required.

Defendants contend in contrast that the case should be analyzed under *Pickering v. Board of Education*, 391 U.S. 563 (1968) as a freedom of expression case. This is a related, though somewhat different inquiry, as *Pickering* examines employee expression in relation to the work-place. In *Pickering*, a teacher was dismissed for writing and publishing a letter criticizing the School Board's allocation of school funds between educational and athletic programs. As explained in *McCabe v. Sharrett*, 12 F.3d 1558 (11th Cir. 1994), the theory behind *Pickering* is that "allowing unchecked public employee expression would be inappropriate because some expression might hinder the performance of public functions, but giving public employers free reign to silence discourse wold also be unacceptable for it would allow employers to censor employee speech because they disagree with its content rather than because it disrupts workplace functioning." 12 F.3d at 1564-65. *Pickering* requires the Court to balance "the interest of the [employee] as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

As the Supreme Court recently explained in *Waters v. Churchill*, 114 S.Ct. 1878 (1994), when the government acts as an employer, it enjoys a "freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large" *id.*, at 1886, because "[w]hen someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." *Id.*, at 1887-88. Thus, even though political speech, the determination of qualifications of candidates for public office, and "[i]nvolvement in the political

11

process is central to the meaning of the First Amendment," *Holley v. Seminole County School Dist.*, 755 F.2d 1492, 1500 (11th Cir. 1985), when the government is acting as the employer of the person whose speech is at issue, then the "government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters v. Churchill*, 114 S.Ct. at 1888.

If the jury determines that plaintiffs were fired for their speech rather than for their failure to support Hutchins' candidacy, the *Pickering* analysis, as later modified and explained in *Waters*, is appropriate. However, it is clear that there must be some modification of this analysis in this case, because at the time of plaintiffs' speech, and of Hutchins' reaction to that speech, Hutchins was not yet the employer (he was a candidate for sheriff and the incumbent county tax commissioner), and plaintiffs Hudson and Hattaway were also candidates (and had taken unpaid leave from their jobs as deputy sheriffs). The evidence will further show that all plaintiffs engaged in the speech at issue either while on leave from their employment, or while out of uniform and off-duty, away from work.

As in *Stough v. Gallagher*, 967 F.2d 1523 (11th Cir. 1992), plaintiffs, like Stough, were "commenting on the qualifications of political candidates", which the *Stough* court found "'is more than self-expression; it is the essence of self-government' and occupies the 'highest rung of the hierarchy of First Amendment values' entitling it to special protection." *Stough*, at 1529. Additionally, plaintiffs' activities, like Stough's speeches, were made during off-duty hours to potential voters, before Hutchins became sheriff, and while voters were still seeking information on the candidates. Like Stough, we believe the jury will find plaintiffs' speech was neither rude nor insulting.

The *Stough* court balanced those First Amendment interests against Gallagher's "interest in

12

promoting the efficiency of the public services his officer performs through his employees." *Id.*, at
1529. The *Stough* court concluded that "Stough's speech greatly tips the *Pickering* balancing scale
in Stough's favor." *Id.* Plaintiffs contend that under the *Pickering* analysis, plaintiffs here are entitled
to prevail.

Should there be a dispute about what the plaintiffs actually said, *Waters* requires that an
employer that seeks to impinge on an employee's first amendment rights must first make an
investigation which is reasonable under the circumstances, before acting. "We think employer
decisonmaking will not be unduly burdened by having courts look to the facts as the employer
reasonably found them to be." *Waters*, 114 S.Ct. at 1889. Thus the jury must determine whether
Hutchins made any reasonable inquiry to determine whether he was punishing plaintiffs for things they
actually said. As the *Waters* Court explained, "we believe that the possibility of inadvertently
punishing someone for exercising her First Amendment rights makes such care necessary." *Id.*

Plaintiffs respectfully submit that the *Pickering* analysis is not appropriate because what the
plaintiffs said is not at issue, rather who they supported (or failed to support) is at issue. Even should
the court decide that *Pickering* applies, the evidence will show that plaintiffs Hudson and Hattaway
campaigned by comparing their own law enforcement experience (extensive) to defendant Hutchins
(none) which is of legitimate public concern, and that they did not disparage defendant Hutchins
personally.

### III. The Law Was Clearly Established
### Therefore Defendant Hutchins Is Not Entitled To Qualified Immunity

The doctrine of qualified immunity shields government officials "from liability for civil
damages insofar as their conduct does not violate clearly established statutory or constitutional rights

13

of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). See also *Anderson v. Creighton*, 483 U.S. 635 (1987); *Bennett v. Parker*, 898 F. 2d 1530 (11th Cir. 1990). In order for a right to be clearly established and therefore defeat an official's claim to qualified immunity,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in light of preexisting law, the unlawfulness must be apparent.

*Lowe v. Aldridge*, 958 F. 2d 1565, 1569-70 (11th Cir. 1992) quoting *Anderson*, 483 U.S. at 642.

The relevant question therefore is "whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." *Stewart v. Baldwin County Board of Education*, 908 F. 2d 1499 (11th Cir. 1990). One must examine each claim at the time the rights were violated.

Defendant Hutchins terminated plaintiffs in violation of their first amendment rights on November 24, 1992. Numerous cases decided before 1992 established the rights of public employees to support the candidate of their choice. *Elrod v. Burns, supra,* was a sheriff's case and held that requiring Republican employees of the Sheriff's department to pledge political allegiance to the Democratic party or work for the election of Democratic candidates constituted an impermissible burden on their first amendment rights. *Sykes v. McDowell,* 786 F. 2d 1098 (11th Cir. 1986) decided that the right of a deputy to not support a sheriff politically was protected, and upheld a substantial damage award against the sheriff. *Stough v. Gallagher,* 967 F. 2d 1523 (11th Cir. 1992) denied qualified immunity to the sheriff and held that the law was clearly established in 1988 that demoting

a deputy sheriff for making speeches in favor of the sheriff's opponent was unconstitutional. *Holley v. Seminole County School Dist.*, 755 F.2d 1492, 1500 (11th Cir. 1985) clearly held in 1985 that "There is no question, nor do appellees dispute, that Holley's candidacy for school superintendent and his efforts to alter the method for selecting school board members are protected by the First Amendment."

Based on these precedents, federal qualified immunity must be denied to defendant Hutchins in his individual capacity.

## IV. Plaintiffs' Claims under Georgia Constitution

Counts IV, V and VI of plaintiffs' complaint arise under the Georgia Constitution.

The specific provisions of the Georgia Constitution which plaintiffs allege were violated by defendants are:

Count IV:

> No law shall be passed to curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish sentiments on all subjects but shall be responsible for the abuse of that liberty.

Article 1, §1, Par. 5 [freedom of speech] ;

Count V:

> The people have the right to assemble peaceably for their common good and to apply by petition or remonstrance to those vested with the powers of government for redress of grievances.

Article 1, §1, Par. 9 [ freedom of association]; and

Count VI:

> All government, of right, originates with the people, is founded upon their will only, and is instituted solely for the good of the whole. Public officers are the trustees and servants of the people and are at all times amenable to them.

15

Article 1, §2, Par. 1.

Several Georgia cases hold that the protections afforded citizens under the Georgia Constitution are greater than those under the federal constitution. For example, *Denton v. Con-Way Southern Express, Inc.*, 261 Ga. 41, 402 S.E. 2d 269, 271 (1991) states: "The Georgia Constitution offers Georgia citizens greater rights and more benefits than the Federal Constitution".

Where there is no controlling state case law, the Georgia courts look to federal standards. "In the absence of controlling state precedent this court has applied analogous First Amendment standards when construing the state constitution." *Paramount Pictures Corp. v. Busbee*, 250 Ga. 252, 297 S.E. 2d 250, 253, n. 5. Plaintiffs' counsel has been unable to locate any Georgia precedent in the area of political firings, and therefore submit that the appropriate standards to apply to plaintiffs' state constitutional claims are the federal standards. There is no qualified immunity for these claims. *D'Aguanno v. Gallagher*, 50 F.3d 887 (11th Cir. 1995); *Andrue v. Sapp*, 919 F.2d 637, 640 (11th Cir. 1990).

Respectfully submitted,

STANFORD, FAGAN & GIOLITO

BY: _____

Marcia W. Borowski
Georgia Bar No. 068625

BY: _____

Megan E. Gideon
Georgia Bar No. 293227

1401 Peachtree Street, Suite 238
Atlanta, Georgia 30309
404/897-1000

16

relatively speaking, "quickly available." We thus conclude that a properly instructed jury would have found Quinn guilty of violating § 924(c)(1) on the basis of the "carrying" prong of the statute, evaluated in light of the evidence adduced.

III. Conclusion

For the foregoing reasons, the convictions and sentence are AFFIRMED.

KEY NUMBER SYSTEM

**Herbert E. BRETT; David Hannah; Wayne D. Hattaway; Jerry O. Hudson, Plaintiffs-Appellants,**

v.

**JEFFERSON COUNTY, GEORGIA; Charles Gary Hutchins, individually and in his official capacity as Sheriff, Jefferson County, Defendants-Appellees.**

No. 96-8553.

United States Court of Appeals, Eleventh Circuit.

Oct. 3, 1997.

Former deputy sheriffs sued county and newly elected sheriff, alleging that sheriff's refusal to reappoint deputies because of their political activities violated their free speech and procedural due process rights under First, Fifth, and Fourteenth Amendments. Deputies also sought fines and attorney fees due to county's failure to offer deputies continued medical coverage, in violation of Public Health Service Act. The United States District Court for the Southern District of Georgia, No. CV193-144, Dudley H. Bowen, Jr., J., 925 F.Supp. 786, granted summary judgment for defendants. Deputies appealed. The Court of Appeals, Birch, Circuit Judge, held that: (1) sheriff could not rely on unconstitutional reasons in refusing to reappoint deputies; (2) deputies had no protected property interest in their positions; and (3) penalties and attorney fees were not available under Consolidated Omnibus Budget Reconciliation Act (COBRA) provisions of Public Health Services Act (PHSA).

Affirmed in part, vacated in part, and remanded.

**1. Sheriffs and Constables ⚷21**

Newly-elected sheriff could not rely on unconstitutional reasons in refusing to reappoint deputy sheriffs whose terms expired upon expiration of term of sheriff under whom they served.

**2. Federal Civil Procedure ⚷2497.1**

Genuine issues of material fact, precluding summary judgment for defendant newly-elected sheriff on his claim that plaintiff deputies' failure to apply for reappointment when he took office barred their claim that his failure to reappoint them for political reasons violated their First Amendment free speech rights, existed as to whether such applications would have been futile.

**3. Constitutional Law ⚷277(2)**

For former deputy sheriffs to establish that newly-elected sheriff's failure to reappoint them violated their procedural due process rights, they had to show that they had protected property interest in their employment. U.S.C.A. Const.Amend. 14.

**4. Constitutional Law ⚷277(2)**

State law determines whether public employee has due process property interest in his or her job. U.S.C.A. Const.Amend. 14.

**5. Constitutional Law ⚷277(2)**

Under Georgia law, public employee generally has no due process property interest unless he or she is employed under civil service system, which allows termination only for cause. U.S.C.A. Const.Amend. 14.

**6. Constitutional Law ⚷277(2)**

Deputy sheriffs who sued newly-elected sheriff for failing to reappoint them had no due process "property interest" in their positions under Georgia law, thus precluding their procedural due process claims; former sheriff's efforts to place deputies under civil service system failed to satisfy statutory requirements, as he made oral, rather than written, application to Board of Commission-

Exhibit A

ers.  U.S.C.A. Const.Amend. 14;  O.C.G.A.
§ 36-1-21(b).

> See publication Words and Phrases
> for other judicial constructions and def-
> initions.

**7. Constitutional Law ⬁277(2)**
**Sheriffs and Constables ⬁21**

Because sheriff who attempted to place
deputies under civil service system failed to
satisfy Georgia's statutory requirements,
deputies were at-will employees with no pro-
tected property interest in continued employ-
ment, despite their claim that de facto civil
service system existed based on sheriff's
adoption and distribution of departmental
rules and regulations that integrated by ref-
erence county civil service system.  U.S.C.A.
Const.Amend. 14;  O.C.G.A. § 36-1-21(b).

**8. Constitutional Law ⬁277(1)**

While protected due process property
interests in continued employment can arise
from policies and practices of institution,
property interest contrary to state law can-
not arise by informal custom.  U.S.C.A.
Const.Amend. 14.

**9. Municipal Corporations ⬁220(9), 1040**

"Appropriate equitable relief," as used in
Consolidated Omnibus Budget Reconciliation
Act (COBRA) provisions of Public Health
Services Act (PHSA) that permit individual
who is aggrieved by government's failure to
comply with requirements of PHSA to bring
action for appropriate equitable relief, does
not include award of fines and attorney fees.
Public Health Service Act, § 2207, as amend-
ed, 42 U.S.C.A. § 300bb-7.

> See publication Words and Phrases
> for other judicial constructions and def-
> initions.

Marcia Borowski, Megan Gideon, Atlanta,
GA, for Plaintiffs-Appellants.

Michael O'Quinn, Margaret E. Sanders,
Barnhart, O'Quinn & Williams, Atlanta, GA,
for Defendants-Appellees.

Appeal from the United States District
Court for the Southern District of Georgia.

Before COX and BIRCH, Circuit Judges,
and RAFEEDIE *, Senior District Judge.

BIRCH, Circuit Judge:

Proceeding under 42 U.S.C. § 1983 and 42
U.S.C. § 300bb-7, four former deputy sher-
iffs, whom a newly elected sheriff did not
reappoint because of their political activities,
appeal the district court's grant of summary
judgment to the county and sheriff.  The
deputy sheriffs contend that the sheriff's fail-
ure to reappoint them violated their free
speech and procedural due process rights
under the First, Fifth, and Fourteenth
Amendments.  They also allege that the dis-
trict court erroneously denied fines and at-
torney's fees based on the county's failure to
offer the deputy sheriffs continued medical
coverage as required under the Public
Health Service Act, 42 U.S.C. § 300bb-6.
We vacate the summary judgment on the
First Amendment claim, affirm the summary
judgment on the additional claims, and re-
mand for further proceedings consistent with
this opinion.

## I.  BACKGROUND

Herbert E. Brett, David Hannah, Wayne
D. Hattaway, and Jerry O. Hudson were
deputy sheriffs in Jefferson County, Georgia
when Zollie Compton, who had been the
sheriff of Jefferson County for more than
thirty years, chose not to seek reelection in
1992.  Prior to that decision, Compton had
taken steps to ensure that his employees fell
under the county's civil service system.  Spe-
cifically, he appeared at a meeting of the
Jefferson County Board of Commissioners in
1989 and requested that his employees be
subject to the Jefferson County personnel
policies, which provide that regular county
employees can be terminated only for cause.[1]
Compton subsequently gave the deputy sher-
iffs documents showing that they were sub-
ject to the county personnel policies and
procedures.

When Compton announced his plans not to
seek reelection in the 1992 election, several

---

*  Honorable Edward Rafeedie, Senior U.S. Dis-
trict Judge for the Central District of California,
sitting by designation.

1.  No record of the request was present in the
minutes of the meeting; however, the record

shows that the minutes of the meetings generally
were not comprehensive.  There is a dispute in
the record as to whether the board officially or
formally adopted the civil service system as ap-
plied to the sheriff's department.

candidates entered the race for sheriff. The candidates who ran in the Democratic primary included Charles Gary Hutchins and deputy sheriffs Hudson and Hattaway.[2] Because there was no majority winner in the primary, a runoff election between Hudson and Hutchins was held.[3] Hutchins, who prevailed in the runoff election, subsequently was elected sheriff in the general election.

Hannah and Brett supported Hudson's campaign in the primary and runoff elections. While they were off-duty, they talked with voters about Hudson's qualifications and wore clothing endorsing his candidacy. Brett, while off-duty, distributed campaign literature and drove a personal car with signs supporting Hudson. After Hudson's defeat in the runoff election, a deputy that supported Hutchins in the general election told Brett and Hannah that they should place Hutchins' campaign signs in their yards to ensure their continued employment. Neither Brett, Hannah, Hattaway, nor Hudson posted campaign signs in their yards for the general election.

Hannah and Hudson approached Hutchins after the runoff election and asked whether Hutchins would reappoint them if he were elected. Based on this conversation, Brett, Hannah, Hattaway, and Hudson believed

that any further attempts to apply for positions under Hutchins would be futile. Hutchins retained several deputy sheriffs who served under Compton and supported Hudson in the primary and runoff elections.[4] After the general election, however, Hutchins informed Brett, Hannah, Hattaway, and Hudson that they would no longer be employed as deputy sheriffs when he took office.[5] Hutchins concedes that his decision not to reappoint them was based on their speech and actions during the election.[6]

When Brett, Hannah, Hattaway, and Hudson were terminated from county employment, they were not informed of their right to continued coverage under the group health care plan. The county concedes that it was required to notify timely in writing the former deputy sheriffs of their rights to continued coverage upon payment of the proper premiums. The county, however, did not inform them that they were eligible for coverage, retroactive to the date of their termination, until after the former deputy sheriffs filed this action. Only Hudson chose to pay the premiums and continue the health insurance coverage.[7]

The former deputy sheriffs filed this action and alleged that Jefferson County and Hutchins violated their rights under the First, Fifth, and Fourteenth Amendments to



2. Hudson and Hattaway announced their candidacies and tendered their resignations. By resolution of the Board of Commissioners, however, the deputy sheriffs were granted leaves of absence without pay during their campaigns.

3. Hattaway returned to work after losing the primary, and Hudson returned after losing the run-off election.

4. Of those deputy sheriffs who supported Hudson and were retained, all but one posted Hutchins' campaign signs in their yards prior to the general election. The one deputy who supported Hudson but was reappointed without posting a campaign sign, however, lived in a remote location and actively campaigned for Hutchins in the general election.

5. There is no dispute that the former deputy sheriffs were not afforded pre- or post-termination hearings. They filed grievances with the Board of Commissioners in accordance with the Jefferson County personnel policies and procedures. Hutchins did not attend the grievance proceeding and no action was taken by the Board.

6. Hutchins denies that his decision not to reappoint the appellants was based solely on their opposition to his election. Rather, he contends that the speech and actions of Brett, Hannah, Hattaway, and Hudson during the campaign were disparaging and destructive. The allegations of negative campaigning and personal attacks on Hutchins, however, are disputed in the record. In addition, although Hutchins offers additional reasons, such as substance abuse and illegal activity, for his decision not to reappoint the former deputy sheriffs, the underlying facts are in dispute.

7. Hudson claims that, because he developed a severe, chronic illness, he was unable to obtain insurance independently and that he had extensive medical costs during the period following his termination. He contends that he wrote the county approximately six months after his termination and requested information about extending his medical coverage. Because the county failed to inform him of his rights to extend his coverage and failed to respond to his letter, he asserts that he suffered stress and anxiety which exacerbated his illness.

the United States Constitution. They also sought fines and attorney's fees incurred when the county failed to offer, as required by 42 U.S.C. § 300bb-6, extended health care coverage after their employment termination. Jefferson County and Hutchins moved for summary judgment. The district court, in a deferred ruling, granted the motion for summary judgment because it determined that the former deputy sheriffs had no property rights in their jobs, which terminated automatically at the end of Compton's term, and that the county's delay in notifying them of their rights to extended health care coverage did not cause harm to the former deputy sheriffs. In view of its judgment on the substantive claims, the district court did not reach the issue of qualified immunity as raised by Hutchins. Brett, Hannah, Hattaway, and Hudson appeal the summary judgment.

## II. DISCUSSION

On appeal, the former deputy sheriffs argue that the district court erred in granting summary judgment because (1) their First Amendment rights were violated when they were denied reappointment because of political patronage, (2) they were entitled to procedural due process in view of their property interests in their jobs, and (3) they were entitled to fines and attorney's fees because they were injured by the delay in notification of their rights to continued health care coverage.[8] We review a grant of summary judgment *de novo* and view the facts in the light most favorable to the nonmoving party. *Jaques v. Kendrick,* 43 F.3d 628, 630 (11th Cir.1995). The movant is entitled to summary judgment only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *United States v. Route 2, Box 472, 136 Acres More or Less,* 60 F.3d 1523, 1526 (11th Cir.1995).

### A. First Amendment Rights

[1] The district court opined that, because the term of the deputy sheriffs expired when Compton left office, Hutchins could have chosen not to reappoint them for any reason or for no reason at all. Upon finding that the newly elected sheriff had an absolute right to appoint whomever he chose, the district court did not scrutinize the former deputy sheriffs' First Amendment claim. The district court, however, was plainly in error. In *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court stated that

> even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in free speech.

*Id.* at 597, 92 S.Ct. at 2697. Furthermore, the Court noted that the principle applies to denials of public employment, not just terminations, and ruled that the lack of a contractual "right" to re-employment during the next academic year was immaterial to a college professor's free speech claim. *Id.* at 597-98, 92 S Ct. at 2697-98. Thus, in view of clear Supreme Court precedent, the district court erred in deciding that no First Amendment analysis was warranted because the former deputy sheriffs had no right to re-employment.

[2] Although the parties recognize that Supreme Court precedent clearly establishes that Hutchins could not refuse to reappoint deputy sheriffs for unconstitutional reasons, they disagree on the proper analysis that the court should apply on remand.[9] Two related

---

8. The former deputy sheriffs also argue that Hutchins was not entitled to qualified immunity because his failure to reappoint the deputy sheriffs violated clearly established constitutional rights. The district court did not address the qualified immunity issue and, because we remand to the district court for additional fact finding relevant to the First Amendment issue, we do not reach this issue here.

9. Jefferson County and Hutchins argue that the deputy sheriffs should be barred from raising the First Amendment claims because they failed to apply for reappointment. Under *Terry v. Cook,* 866 F.2d 373 (11th Cir.1989), however, the failure to apply is irrelevant to a First Amendment claim if the application would have been futile. *Id.* at 379-79. The futility of any applications by the former deputy sheriffs is disputed in the record and, thus, cannot support the summary

lines of cases have evolved—"those involving employee expression and those involving 'raw political patronage.'" *Terry v. Cook,* 866 F.2d 373, 375 (11th Cir.1989). In cases involving employee expression, the balancing test stated in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), requires the court to balance "the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734-35. In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court articulated the standard to be applied in political patronage cases: "[C]onditioning the retention of public employment on the employee's support of the in-party ... must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Id.* at 363, 96 S.Ct. at 2685. Conditioning employment on political patronage, however, may be constitutionally acceptable if the "hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980). Both the *Pickering* and the *Elrod-Branti* tests are balancing tests. The *Elrod-Branti* test, however, "does not require openended inquiries into specific work-place relationships ... because the public employee's interests and the public employer's interests are essentially fixed and unvarying in the raw political patronage context." *Slough v. Gallagher,* 967 F.2d 1523, 1527 (11th Cir. 1992).

The former deputy sheriffs argue that the *Elrod-Branti* test should apply. They contend that Hutchins failed to reappoint them solely because they did not support Hutchins in his campaign for sheriff.[10] Jefferson County and Hutchins, however, argue that the *Pickering* standard is appropriate because Hutchins chose not to reappoint the deputy sheriffs due to their negative campaigning and disparaging remarks.[11] Whether the former deputy sheriffs engaged in negative campaigning or made disparaging remarks is disputed in the record.

The district court must decide on remand which balancing test to apply, *Pickering* or *Elrod-Branti.* Choosing the proper test, however, turns on certain predicate factual issues which are in dispute: the basis for Hutchins' failure to rehire Brett, Hannah, Hattaway, and Hudson and the nature of the political activity in which the former deputy sheriffs participated. Thus, we remand for additional fact finding so that the district court can decide which test properly to apply in the First Amendment analysis.[12]

**B. Right to Procedural Due Process**

[3-5] No due process hearing was provided to Brett, Hannah, Hattaway, or Hudson upon Hutchins failure to reappoint them as deputy sheriffs. The former deputy sheriffs, thus, argue that they were denied their constitutional right to procedural due process. To establish such a claim, the former deputy sheriffs must show that they had a protected property interest in their employment. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). "State law determines whether a public employee has a property interest in his or her job." *Warren v. Crawford,* 927 F.2d 559, 562 (11th Cir.1991). Un-

judgment. The finder of fact must make such a determination on remand.

10. We note that "[o]ur circuit has not limited political patronage cases strictly to those cases involving party affiliation, but has recognized that the *Elrod/Branti* analysis applies whenever public employment is 'conditioned upon political allegiance and not upon the content of expression of political beliefs.'" *Morris v. Crow,* 117 F.3d 449, 456. (11th Cir.1997)(quoting *Terry,* 866 F.2d at 377).

11. Jefferson County and Hutchins do not challenge the point that the speech of the former deputy sheriffs related to matters of public concern as it related to the election of the sheriff of Jefferson County.

12. Once the district court decides which test to apply, the qualified immunity issue also can be decided.

der Georgia law, a public employee generally has no protected property interest unless he or she is employed under a civil service system, which allows termination only for cause. *Id.*

[6] The district court opined that the former deputy sheriffs had no protected property interest under Georgia law because Compton's efforts to place the deputy sheriffs under the civil service system failed to satisfy the statutory requirements of O.C.G.A. § 36–1–21(b). We agree. Sheriffs have statutory authority to appoint deputy sheriffs at their discretion. O.C.G.A. § 15–16–23. Section 36–1–21(b), however, provides a means for extending the civil service system to departments, like the Jefferson County Sheriff's Department, which are subject to the jurisdiction of elected county officers. Specifically, section 36–1–21(b) requires that (1) the elected county officer apply to the proper governing authority in writing for such an extension and (2) the governing authority formally provide by ordinance or resolution that the positions be subject to the county civil service system. There is no evidence in the record that Compton made a written application to the Board of Commissioners; rather, the former deputy sheriffs allege that Compton made the request orally at a meeting of the Board. Thus, even if the Board passed the necessary resolution or ordinance,[13] the formal requirements of section 36–1–21(b) were not satisfied and the deputy sheriffs were not subject to the Jefferson County civil service system.

[7, 8] The former deputy sheriffs contend that, even if the statutory requirements were not satisfied, a *de facto* civil service system existed based on Compton's adoption and distribution of departmental rules and regulations that integrated by reference the county civil service system. While protected property interests in continued employment can arise from the policies and practices of an institution, *Perry*, 408 U.S. at 602–03, 92 S.Ct. at 2700, a property interest contrary to state law cannot arise by informal custom, *Warren*, 927 F.2d at 564. In the absence of

satisfaction of the requirements of section 36–1–21(b), the deputy sheriffs were at-will employees with no protected property interest in continued employment. Thus, we affirm the summary judgment on the former deputy sheriffs' procedural due process claim.

## C. Fines and Attorney's Fees

[9] The former deputy sheriffs contend that the district court erred by denying their request for fines and attorney's fees based on Jefferson County's failure to comply with the Consolidated Omnibus Budget Reconciliation Act ("COBRA") notification requirements set forth in the Public Health Services Act ("PHSA"), 42 U.S.C. § 300bb–6. The CO-BRA amendments of the PHSA provide that state and local governments must offer to terminated public employees continued health plan coverage for a specified time following their termination. 42 U.S.C. § 300bb–1 to § 300bb–3. Furthermore, the PHSA requires that the plan administrator, within fourteen days of his notification of the employee's termination, notify the terminated employee in writing of the employee's right to elect to continue the coverage. 42 U.S.C. § 300bb–6. The county failed to notify the former deputy sheriffs of their rights to continued coverage until after the former deputy sheriffs filed this action, at which time the county offered each former deputy sheriff the proper coverage. The former deputy sheriffs contend that they are entitled to fines and attorney's fees because 42 U.S.C. § 300bb–7 allows an individual who is aggrieved by the government's failure to comply with the requirements of the PHSA to "bring an action for appropriate equitable relief."

COBRA amended both the PHSA and the Employment Retirement Income Security Act ("ERISA") and included similar coverage and notification provisions in each act. *Williams v. New Castle County*, 970 F.2d 1260, 1264 (3d Cir.1992). The COBRA provisions of ERISA and PHSA represent parallel statutory schemes. ERISA, however, ex-

---

13. The record is devoid of any evidence that the Board of Commissioners passed a formal resolution or ordinance to make the deputy sheriffs subject to the civil service system. The former

deputy sheriffs, however, contend that the minutes of the meetings of the Board of Commissioners are not complete, and the parties acted as if the resolution or ordinance had been passed.

cludes public employees covered by government health plans from ERISA's employee benefit plan provisions, 29 U.S.C. § 1003(b)(1), whereas the PHSA applies only to such employees. The two acts can be further distinguished because ERISA provides broader relief to aggrieved private employees than the PHSA provides to similarly situated public employees. *Mansfield v. Chicago Park Dist. Group Plan,* 946 F.Supp. 586, 591 (N.D.Ill.1996). For example, ERISA not only provides for "appropriate equitable relief," 29 U.S.C. § 1132(a)(3), but also explicitly provides for the recovery of fines and attorney's fees, 29 U.S.C. §§ 1132(c) and (g). The PHSA contains no provisions regarding the recovery of fines or attorney's fees and instead limits relief to "appropriate equitable relief." 29 U.S.C. § 1003(b)(1). The former deputy sheriffs would have us read the phrase "appropriate equitable relief" in the COBRA provisions of the PHSA to include fines and attorney's fees. We decline to do so in view of Congress's decision that ERISA should provide more extensive remedies than the PHSA. Rather, we determine that the PHSA and ERISA, viewed together, show that Congress would have included provisions for fines and attorney's fees in the PHSA had it intended that such relief should be available to public employees.[14] Thus, we affirm the district court's grant of summary judgment on the former deputy sheriffs' COBRA claim.[15]

## III. CONCLUSION

In this appeal of summary judgment, Brett, Hannah, Hattaway, and Hudson, former deputy sheriffs of Jefferson County, Georgia, contend that the county and Hutchins, as the newly elected sheriff, violated their constitutional rights by failing to reappoint them because of their political activities and by failing to provide pre- or post-termination hearings. They further contend that

they are entitled to fines and attorney's fees since the county failed to timely notify them, as required by 12 U.S.C. § 300bb-6, of their right to continued health plan coverage. We determine that (1) because Hutchins could not refuse to reappoint the deputy sheriffs for unconstitutional reasons, the district court erred in failing to analyze the former deputy sheriffs' First Amendment claim, (2) under Georgia law, the former deputy sheriffs had no protected property interest in continued employment and were not entitled to procedural due process, and (3) the COBRA provisions of the PHSA, in contrast to the COBRA provisions of ERISA, provide only for "appropriate equitable relief" and not for the award of fines and attorney's fees. Thus, we AFFIRM the summary judgment on the due process claim and the COBRA claim but VACATE the summary judgment on the First Amendment claim and REMAND for further proceedings consistent with this opinion.



Pedro Pablo MESA, Mercedes Mesa, Maria Luz Galdeano, Carlos Galdeano, David Galdeano, Plaintiffs–Appellants,

v.

UNITED STATES of America, Michael Dolan, Jaime Camacho, Defendants–Appellees.

No. 96–4724.

United States Court of Appeals, Eleventh Circuit.

Oct. 7, 1997.

Arrestee brought action under Federal Tort Claims Act (FTCA) against Drug Enforcement Administration (DEA) agents who arrested him in case of mistaken identity.

---

14. Interpreting the term "appropriate equitable relief" narrowly to include those types of relief traditionally available at equity, like injunction, declaratory relief, and restitution, is consistent with the interpretation by the Supreme Court of the same phrase in ERISA. *See Mertens v. Hewitt Assocs.,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)(interpreting the relief available under 29 U.S.C. § 1132(a)(3)).

15. Because we hold that fines and attorney's fees are not within the scope of "appropriate equitable relief" under the PHSA, we need not decide whether the former deputy sheriffs, and Hudson in particular, were injured by the county's failure to timely notify the former deputy sheriffs of their right to continued coverage.